ARTHUR M. HIGGINS v. LEIGH C. LAMOREAUX.[1]

May 15, 1925.

No. 24,504.

**Deed was in fact a mortgage.**

The finding that the deed in controversy was given as security and is in fact a mortgage is sustained by the evidence.

1. See Mortgages, 27 Cyc. p. 1025.

Action in the district court for Hennepin county for an accounting and the appointment of a receiver. The case was tried before Molyneaux, J., who ordered judgment in favor of defendant. Plaintiff appealed from an order denying his motion for a new trial. Affirmed.

*A. M. Higgins* and *Le Roy Bowen*, for appellant.

*James A. Peterson* and *A. D. Smith*, for respondent.

[1]Reported in 203 N. W. 961.

TAYLOR, C.

On May 12, 1914, Dr. Irving C. McDonald, then the owner, conveyed to defendant a tract of land in the city of Minneapolis on which an apartment building was completed in September, 1914. Thereafter defendant executed a deed for an undivided one-half of the property to his father, Lowell A. Lamoreaux. Lowell A. Lamoreaux died February 1, 1922. In 1923, plaintiff, as special administrator of his estate, brought this action asserting that the decedent was the owner of an undivided one-half of the property; and that defendant was collecting and appropriating to his own use all the rents and income therefrom without paying the instalments due on the mortgages thereon; and asked for an accounting and that a receiver be appointed to take charge of the property. The defendant asserted that he was the sole owner of the property, and that the deed was in fact a mortgage given as security for advances made by his father in the construction of the building, and asked for judgment declaring it a mortgage and that it had been satisfied. The court found that the deed was in fact a mortgage and that there was still a balance due thereon and directed judgment to that effect. Plaintiff appealed from an order denying a new trial.

The question presented is whether the finding that the deed was given as security only is sustained by the evidence.

Lowell A. Lamoreaux was a member of the firm of Long, Lamoreaux and Long, prominent architects of the city of Minneapolis, and at the time of the transaction in question had an income of about $15,000 per year. A young man named Peteler, a friend of defendant, was engaged in the real estate business. He ascertained that Dr. McDonald would sell the land in question for $11,500 as a site for an apartment building and would advance $5,000 toward the construction of the building and take a second mortgage for $16,500, the entire amount of the purchase price and advancement, permitting the purchaser to obtain other funds for the construction of the building by placing a first mortgage thereon. Peteler presented the proposition to defendant and they concluded to purchase the property and erect the building. Before the deal was consum-

mated, however, Peteler learned that more money would be required than could be raised on the mortgages, and, not being in position to furnish his share, withdrew as a party to the project. Defendant was then a young man 23 years of age, living at home with his parents. He and his father carried out the project.

The father being dead, the statute closes defendant's mouth as to the arrangement between them. The original negotiations had been between the young men and an agent of Dr. McDonald. The final agreement was made by defendant's father with Dr. McDonald himself. The doctor testifies that the father said he was buying the property for his son.

The doctor conveyed the land to defendant for $11,500 and advanced $5,000 toward the building, and defendant executed to the doctor his promissory note for $16,500, secured by a mortgage on the property which expressly provided that it should be subject to any mortgage then or thereafter executed for a sum not exceeding $25,-000. In July, 1914, a loan of $25,000 was obtained from Thorpe Brothers, for which defendant gave his promissory note secured by a first mortgage on the property. Defendant prepared the plans for the building with the advice and assistance of his father and both took part in supervising its construction. It was completed in September, 1914. The father advanced money for its completion, amounting to the sum of $5,931.85, as found by the trial court.

The deed in controversy is dated September 30, 1914, but was not executed until May, 1915, and was not recorded until November, 1920. Defendant was absent in Wisconsin from September, 1915, to January, 1919. In 1916, while defendant was absent, the father negotiated a lease of the property to Benjamin A. Paust for a term of 100 years at a rental of $4,800 per annum for the first ten years and $4,500 per annum for the remainder of the term. The father then held his deed but had not recorded it. Paust testifies that he made a proposition of $4,500 per annum for the entire term; that the father said the property belonged to defendant and he would take up the proposition with defendant; that after doing so the father said that $4,500 was not sufficient for the first ten years as defendant had payments to make during that period; that the rental

was then raised to $4,800 for the first ten years; and that the lease was drawn up and executed by him and then sent to defendant who executed and returned it. The lease provides that the rentals are to be paid to defendant. The father is one of the subscribing witnesses to the signature of Paust which would be improper if he was a part owner of the property.

Paust subsequently transferred the lease to the Crystal Land Company and that company thereafter transferred it to the Federal Mortgage & Holding Company. The consent of the fee owner was necessary to effect these transfers. Louis E. Harrington was secretary of the Crystal Land Company. He testifies that in each instance he talked with the father for the purpose of obtaining such consent; that the father told him that the property belonged to defendant, then absent in Wisconsin; and that in consequence of this fact their deal was held up while papers were sent to defendant for his approval. Several friends of the father, who had nothing to do with the property, testified that he told them that it belonged to defendant, and no one testified that he ever made any statement to the contrary.

An account was opened in the bank under the heading of flat account. Rentals from the building were deposited in this account and disbursements were paid by checks drawn on it. Thorpe Brothers had charge of the building and collected the rentals until October, 1915. The checks for the rentals were sent to the father's office and, although apparently payable to defendant, were indorsed by a clerk and deposited in the flat account. From October, 1915, to December, 1919, the father collected the rentals and deposited them in this same account. In December, 1919, defendant, who had returned to Minneapolis some months before, began collecting the rentals and has collected them ever since. Until December, 1919, the checks on the flat account seem to have been drawn by the father; after that date they were drawn by defendant.

In December, 1917, the father obtained a divorce from his wife, defendant's mother. In December, 1919, he went to Los Angeles, California, where he opened a branch office for the firm. In 1920 he married again. Thereafter he placed the deed on record. Some

friction seems to have arisen in consequence of defendant's insistence that his father make provision for his mother, and this was perhaps intensified by the position taken in respect to the father's property by his second wife. The father, by his will, gave all his property to the second wife.

It is undisputed that defendant assumed sole liability for the purchase price of the property and for all the encumbrances placed on it, and that the father assumed no liability therefor. The father advanced the major part of the additional money necessary to complete the building but reimbursed himself therefor, in part, by drawing funds out of the flat account. After going to California, his financial condition seems to have changed so that he was in need of money. In May, 1921, he wrote defendant calling attention to the money he had put into the building and to the fact the rental would pay the interest and $1,000 of principal due Thorpe Brothers, and the interest and $1,650 of principal due Dr. McDonald and leave a surplus, and asked that he be paid this surplus. He further wrote:

"I would also like you to see Dr. McDonald and have him defer this year's payment and send that to me thus reducing the obligation the flat has to me $1,650. The doctor does not need the money and you can show him that the property is prosperous and I feel sure you can put it over. * * * The above is requested because in the first place it is only fair that I should get something of the interest by this time, and as soon as possible of the principal. * * * I want if possible to dispose of my interest in the property. Holton does not think there is much prospect of doing it now, but it is good property and should be sold if any property can be."

There are many facts which we have not mentioned, but those referred to are sufficient to show that there was evidence from which the court could legitimately find that the deed was intended as security only, and the finding to that effect must stand. Holien v. Slee, 120 Minn. 261, 139 N. W. 493; Eyre v. City of Faribault, 121 Minn. 233, 141 N. W. 170, L. R. A. 1917A, 685.

While many of the rulings at the trial are assigned as error, these assignments are not argued in the brief, and we find none calling for special attention.

Order affirmed.